Hillsborough-northern judicial district
No. 2010-402

THE STATE OF NEW HAMPSHIRE

v.

RODERICK DAVIDSON

Argued: October 20, 2011
Opinion Issued: April 10, 2012

464

*Michael A. Delaney*, attorney general (*Elizabeth C. Woodcock*, assistant attorney general, on the brief and orally), for the State.

*Lisa L. Wolford*, assistant appellate defender, of Concord, on the brief and orally, for the defendant.

CONBOY, J. The defendant, Roderick Davidson, appeals his conviction, following a jury trial, on three counts of simple assault and one count of criminal mischief. He argues that the Superior Court (*Mohl*, J.) erred by: (1) denying his motions *in limine* to exclude evidence that he "controlled" the complainant; and (2) denying his request for a defense of property instruction. We affirm in part, reverse in part, and remand.

The jury could have found the following facts. In October 2009, the defendant and the complainant lived together. On October 11, they were both at work at the Olive Garden restaurant in Manchester when the defendant became upset because of an interaction between the complainant and a male manager. Consistent with their habit of "br[eaking] up every other day," the defendant broke up with the complainant. They nonetheless drove home together, napped together for about three hours, and then went to dinner together at a restaurant.

After dinner, during which they both consumed some alcohol (the respective amounts of which are contested), the defendant and the complainant split payment of the bill, but the defendant paid a smaller portion. The defendant then drove the couple home, where they began to argue about money. The complainant insisted that they talk, attempting to speak to the defendant through a closed door and calling his cellular telephone number repeatedly. Later, when the defendant was sitting on a couch with his wallet and keys on a nearby table, the complainant grabbed the keys with the purpose of preventing the defendant from driving, and with them headed up the stairs. The defendant followed her. The complainant testified that during the ensuing struggle over the keys, the defendant grabbed her as she was halfway up the stairs and threw her into a wall; the defendant testified that he and the complainant fell together on the stairs. The accounts agree that the complainant ended up on her back at the bottom of the stairs with the defendant above her, and that his hand made contact with her face. The complainant testified that the defendant twisted her arm and told her he would break it. The defendant ultimately recovered the keys and went out to his car.

The complainant followed the defendant and stood behind his car, blocking his departure. When she moved from the rear to the side of the car, calling the defendant repeatedly and knocking on his window, the

defendant put the car into reverse and pressed the accelerator. The side view mirror made contact with the complainant and was dislodged. The complainant reentered their home and locked the door.

After realizing the mirror had been dislodged, the defendant returned to the home. He testified that when he pounded on the bolted door, the complainant opened it and let him in; she testified that the defendant pounded on the door before opening it with his key. The defendant then attempted to barricade himself in the bedroom. When the complainant insisted that he leave the bedroom, he knocked a hole in the bedroom door with either his fist or his elbow.

The following day, the complainant had a bruised eye, which she tried to conceal with makeup. After speaking with several people, she ultimately decided to go to the police. The defendant sent several "angry" and "spiteful" text messages to the complainant, including, "I see u put makeup on u f***ing crazy slut. Who r u f***ing now?"; "Where the f*** r u"; "TELL ME WHERE YOU ARE"; and "U r full of sh**, tell me where u are." The defendant moved out of the home that afternoon. That evening, the defendant sent the complainant another text message, apologizing and telling the complainant, "The door will be taken care of."

The defendant was charged with: three counts of simple assault stemming from the physical contact inside the apartment; criminal mischief, based upon damage to the bedroom door; reckless conduct, based upon the car's contact with the complainant; and criminal threatening, based upon the defendant's alleged threat to break the complainant's arm. The defendant was convicted of criminal mischief and the three counts of simple assault, but was acquitted of reckless conduct and criminal threatening. This appeal followed.

The defendant first argues that the trial court erred in denying his two motions *in limine* seeking to exclude evidence under New Hampshire Rule of Evidence 404(b) (regarding the inadmissibility of character evidence). The defendant's first motion *in limine* sought to exclude testimony tending to suggest that he was "controlling" and set rigid behavioral rules for the complainant, the admission of which, he argued, violated New Hampshire Rules of Evidence 401, 402, 403, 404(a), 404(b), and 608, as well as his state and federal due process rights. The evidence included testimony that the complainant had previously sought a restraining order against the defendant; that the defendant had broken up with the complainant at work because she was speaking with a male manager; that he was controlling and jealous; that he did not allow her to speak with other males and rarely allowed her to wear makeup; that he was verbally cruel to her at work; and that he had previously assaulted her. The second motion asserted that the

content of some of his text messages to the complainant, sent the day after the incident, was inadmissible under New Hampshire Rules of Evidence 401, 402, 403, and 404.

■■ "The decision to admit 'bad acts' evidence lies within the trial court's sound discretion and will be overturned only if the defendant can show that the decision was clearly untenable or unreasonable to the prejudice of his case." *State v. McGlew*, 139 N.H. 505, 507 (1995). As to the criminal mischief conviction stemming from the damage to the apartment's bedroom door, the defendant appears to have conceded the facts underlying that conviction. *Compare* the charging document (alleging that defendant "did commit the crime of Criminal Mischief in that, having no right to do so nor any reasonable basis for belief of having such a right, the defendant recklessly damaged the property of another when he punched a hole in a door inside the apartment of [the complainant], contrary to the form of the Statute") *with* defendant's testimony at trial (stating that he damaged the door by putting a hole in it with his elbow because "[he] was just upset. . . . [he]'d had enough"), *and* acknowledgement in his brief (" 'Stressed' and aggravated that [the complainant] wouldn't stop yelling at him, [the defendant] elbowed the bedroom door, putting a hole in it."). *See* RSA 626:2, II(c) (2007) (defining " 'Recklessly' "); RSA 626:2, III (2007) ("When recklessness suffices, the element is also established if the person acts purposely or knowingly."). Thus, as to this charge, the defendant cannot demonstrate that the court's rulings were "clearly untenable or unreasonable to the prejudice of his case." *Id.*; *see also State v. Stott*, 149 N.H. 170, 172 (2003). We therefore affirm that conviction, and turn to the defendant's claims of error as to his simple assault convictions.

Before and during trial, the defendant argued that the evidence of his controlling behavior was irrelevant, unfairly prejudicial, and constituted inadmissible "propensity" character evidence. The State responded that it did not seek to admit evidence of the defendant's prior conduct to show that he acted in conformity therewith, but rather "to show the defendant's *motive* and *intent* at the time." It argued that the defendant's "state of mind during the charged conduct [was] relevant," both for the purpose of establishing his motive for the charged conduct, and to counter his argument that he was acting only in defense of his property.

In ruling on the admissibility of the evidence of the defendant's allegedly controlling behavior, the trial court distinguished between opinions that the defendant was a controlling person, which it excluded as inadmissible character evidence, and "facts" of the defendant's controlling behavior (including statements), which it found admissible to provide "context." The trial court ruled:

> It's my view that in order to understand this case, the jury has to understand the context in which it is presented, and for that reason, statements that the defendant may have made in the recent time period of the alleged assaults are, in my view, that describe the relationship and his alleged controlling behavior, are admissible, because I think the jury has to understand the context in which this case is set. . . . [F]acts that demonstrate that behavior are admissible in my judgment.

With regard to the text messages, the court ruled that they were likewise relevant "[t]o the extent [they] deal[t] with the question of controlling behavior." The court did not issue a limiting instruction concerning the purposes for which the jury could consider the evidence. The court further ruled that evidence of prior assaults would be excluded, unless the defense cross-examined the complainant as to her delay in reporting the charged conduct.

At trial, the defendant's "controlling" behavior was a central theme of the State's case, beginning with its opening statement and continuing throughout its witness examinations. The defendant maintains that evidence of his alleged "controlling behavior" was inadmissible under Rule 404(b), and that its admission prejudiced his case. He argues that the State failed to establish a clear and logical connection between the evidence of his alleged controlling behavior and the charged conduct, and failed to provide clear and convincing evidence that the alleged controlling behavior had occurred. He further asserts that the prejudicial effect of the evidence, which cast him as a domestic abuser, substantially outweighed any probative value.

The State responds that Rule 404(b) does not apply because the evidence was in the form of the defendant's statements, which "were not, in and of themselves, bad acts." It asserts that his statements were admissible under Rule 801(d)(2)(A) as statements of a party-opponent, and, therefore, the test of their admissibility is set forth in Rule 403 (regarding exclusion of relevant evidence). The State argues further that, even if the evidence were subject to a Rule 404(b) analysis, it was properly admitted as evidence of the defendant's motive and intent.

Assuming that the text messages constituted "statements," rather than prior "bad acts," *but see, e.g., State v. Pepin*, 156 N.H. 269, 275-79 (2007) (analyzing verbal threat under Rule 404(b)), we conclude that the "controlling behavior" evidence nonetheless consisted of intertwined statements and actions subject to analysis under Rule 404. *See, e.g., State v. Richardson*, 138 N.H. 162, 164-65 (1993) (analyzing defendant's intertwined statements and behavior shortly preceding charged events under Rule 404(b)).

■ "The purpose of Rule 404(b) in a criminal trial is to ensure that the defendant is tried on the merits of the crime as charged and to prevent a conviction based on evidence of other crimes or wrongs." *McGlew*, 139 N.H. at 509 (quotations omitted). "The concern that a defendant might be convicted because of his character is the gravamen of Rule 404(b)." *Id.* Thus, in order for evidence to be admissible under Rule 404(b), it "must be relevant for a purpose other than proving the defendant's character or disposition; there must be clear proof that the defendant committed the act; and the probative value of the evidence must not be substantially outweighed by its prejudice to the defendant." *Id.* at 507. Here, the defendant challenges the trial court's decision under all three prongs of the Rule 404(b) analysis.

■ "To meet the relevancy requirement, the other bad acts evidence must have some direct bearing on an issue actually in dispute, and there must be a clear connection between the particular evidentiary purpose, as articulated to the trial court, and the other bad acts." *State v. Kirsch*, 139 N.H. 647, 654 (1995) (quotations, citations, and brackets omitted). To admit evidence over a defendant's Rule 404(b) objection, "the State is required to state the specific purpose for which the evidence is offered and articulate the precise chain of reasoning by which the offered evidence will tend to prove or disprove an issue actually in dispute, without relying upon forbidden inferences of predisposition, character, or propensity." *State v. Glodgett*, 144 N.H. 687, 690 (2000) (quotations and ellipsis omitted). "The trial court then must articulate for the record the theory upon which the evidence is admitted." *Id.* at 690-91 (quotations omitted). "Whether the court adopts the State's theory, a variation, or an alternative, the court must explain precisely how the evidence relates to the disputed issue, without invoking propensity." *McGlew*, 139 N.H. at 510. Here, the State offered the evidence as proof of the defendant's motive and intent, and to counter his asserted justification defense. The trial court, however, admitted the defendant's statements and "facts that demonstrate" the defendant's controlling behavior in order for the jury "to understand the context in which this case is set."

■ "Rule 404(b) does not specifically provide for the admissibility of other acts evidence to prove context, but it does allow such evidence to be admitted for any purpose other than to prove the character of a person in order to show that the person acted in conformity therewith." *State v. Melcher*, 140 N.H. 823, 829 (1996) (quotations omitted). "We have indicated that context may be among these other purposes." *Id.* However, "[t]o be relevant, this evidence must still have some direct bearing on an issue actually in dispute, apart from its tendency to show propensity." *Id.* We

have previously held that the context of a relationship may be relevant if the State establishes an acceptable non-propensity purpose under Rule 404(b). *E.g., State v. Beltran,* 153 N.H. 643, 648-49 (2006) (evidence of the defendant's abuse of his girlfriend, a prosecution witness, held admissible to explain her participation in criminal conduct, her delay in reporting, and her initial false statements to police); *State v. Roberts,* 136 N.H. 731, 747 (1993) (in witness tampering prosecution, testimony of defendant's prior sexual relationship with witness involving exchange of drugs and money for sex was relevant to defendant's belief that the witness would testify in the underlying prostitution and drug conspiracy cases); *State v. Simonds,* 135 N.H. 203, 207 (1991) (evidence of defendant's prior indictments for sexually assaulting the victim admissible as probative of his specific intent to touch her for the purpose of sexual arousal or gratification rather than innocently); *State v. Gruber,* 132 N.H. 83, 89 (1989) (in an insurance fraud case, evidence of defendant's relationship with the woman who "stole" his property admissible to show that he intended to deceive the insurance company).

▮ Here, the defendant objected both before and at trial to admission of the evidence on the basis that it reflected only his propensity to commit the charged crimes. Before ruling that the evidence was relevant to establish the "context" of the case, the trial court asked defense counsel, "Why don't you tell me why all this [evidence of the defendant's controlling behavior] is not relevant in a domestic — what appears to be a domestic violence case." The trial court also stated, "Well, it's not propensity if it fits in the crime." The trial court then allowed admission of evidence of the defendant's controlling behavior, including the text messages and testimony that the complainant "could not talk to males, that she could not wear makeup, that [the defendant] called her names," and that he said he had control over her life — not, as the State had argued, for the purpose of establishing the defendant's motive and intent, but for the broader purpose of providing "context." Because the court admitted the evidence for a broader purpose than the State had proposed, without limitation, the jury was apparently free to consider the evidence for any purpose — including propensity. "The purpose for giving . . . a limiting instruction is to explain the proper purpose or purposes for which the evidence may be used and thereby minimize the danger that the jury will draw impermissible inferences from the evidence of the defendant's other crimes." *State v. Hickey,* 129 N.H. 53, 61 (1986); *see also State v. Smith,* 125 N.H. 522, 526 (1984) ("The trial court, when giving *limiting* instructions, must take care that the instructions do indeed strive to limit the jury's consideration to the *narrow* purpose or purposes for which the evidence is being admitted.").

■ The defendant argued to the trial court, in support of his motions *in limine*, that to permit such unlimited use of the evidence would allow the State to "couch[] these prior bad acts . . . in the language and the buzz words typically used to describe domestic violence and the cycle of violence." Indeed, because the trial court allowed the "context" evidence without limitation, the State at trial seized the opportunity to portray the dynamic between the defendant and the complainant as that of a controlling perpetrator and controlled victim, and to characterize the defendant as "an abuser." "Context, in this instance, [became] merely a synonym for propensity." *Melcher*, 140 N.H. at 830 (quotation omitted); *see also Glodgett*, 144 N.H. at 694; *State v. Bassett*, 139 N.H. 493, 501-02 (1995). "When, in this manner, an assumption based upon the defendant's propensity toward certain action is the essential connection in the inferential chain supporting relevance, the evidence is inadmissible under Rule 404(b)." *Glodgett*, 144 N.H. at 695 (quotation omitted). The admission of the evidence was therefore erroneous because it was not limited to a non-propensity purpose. Since we reach this result on the relevance prong of the analysis, we do not address the two remaining prongs of the Rule 404(b) inquiry, *see, e.g., id.* at 690, or any Rule 403 analysis.

Nor can we look to the State's proffered justifications as valid alternative grounds to support the trial court's ruling. *See State v. Nightingale*, 160 N.H. 569, 575-76 (2010). Because the trial court's ruling, that the evidence was relevant to "context," allowed admission of a broader scope of evidence than would have been permissible for the narrower purpose of establishing motive or intent, we cannot parse the record after the fact to determine what items of evidence could have been admissible under the State's proffered purposes. Thus, by our decision today, we make no ruling on the potential admissibility of the text messages or other evidence of the defendant's controlling behavior upon retrial. Individually evaluated items of evidence may be admissible for non-propensity purposes "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." N.H. R. Ev. 404(b).

■ ■ The admission of improper character evidence is inherently prejudicial. *See, e.g., Glodgett*, 144 N.H. at 695; *Hickey*, 129 N.H. at 61-62. Further, the State has neither asserted nor established that such error was harmless. *See State v. Marti*, 140 N.H. 692, 695 (1996) ("The burden is on the State to prove harmless error, and this burden is met only if we can conclude beyond a reasonable doubt that the evidence did not affect the verdict." (quotations omitted)). Accordingly, we conclude that the defendant has established that the trial court's error was "clearly untenable or

unreasonable to the prejudice of his case." *McGlew*, 139 N.H. at 507. The three simple assault convictions are therefore reversed.

In light of our reversal of the simple assault convictions, any error by the trial court concerning the jury instructions on those charges is moot. However, because the defendant's contention that he was entitled to a jury instruction on the use of force in defense of property may arise on remand, we consider it. *Cf., e.g., State v. White*, 155 N.H. 119, 128 (2007).

 "The purpose of the trial court's charge is to state and explain to the jury, in clear and intelligible language, the rules of law applicable to the case." *State v. Hernandez*, 159 N.H. 394, 400 (2009). "When reviewing jury instructions, we evaluate allegations of error by interpreting the disputed instructions in their entirety, as a reasonable juror would have understood them, and in light of all the evidence in the case." *Id.* "We determine whether the jury instructions adequately and accurately explain each element of the offense and reverse only if the instructions did not fairly cover the issues of law in the case." *Id.* "Whether a particular jury instruction is necessary, and the scope and wording of jury instructions, are within the sound discretion of the trial court, and we review the trial court's decisions on these matters for an unsustainable exercise of discretion." *Id.* "To show that the trial court's decision is not sustainable, the defendant must demonstrate that the court's ruling was clearly untenable or unreasonable to the prejudice of his case." *State v. Lambert*, 147 N.H. 295, 296 (2001) (quotation omitted).

Prior to trial, the defendant filed a notice of defense indicating that he would potentially rely upon RSA 627:8 (2007), the statute defining the justification of use of force in property offenses. At trial, the defendant requested a jury instruction on the defense of property based upon the complainant's having taken his car keys. The trial court ruled:

> I'm satisfied that in raising the defense of justification in this case in defense of property, there has to be sufficient evidence from which the jury could make such a determination, certainly, some evidence from which a jury could consider the issue.
>
> The question here is whether or not the defendant was facing a situation in which he observed or reasonably could have believed that there was an unlawful taking of his property. An unlawful taking, *essentially a theft, as defined by statute*, requires a person to deprive of the property permanently, or I think in the language of the statute, for such duration and time that reduces the economic value of the property in substance. And I don't believe that there's any evidence to support such a finding; and therefore,

it would be error for me to include a defensive justification to whatever charges that they may have relevance — certainly of the assaults, potentially of criminal defending [*sic*], although I have serious doubts about that. In any event, I decline to give that instruction.

(Emphasis added.) On appeal, the defendant argues that he was entitled to an instruction on defense of property, and that the trial court's ruling prejudiced his case.

We consider only the basis of the trial court's decision — that the use of force in defense of property is justified only in cases of theft. "The interpretation of a statute is a question of law, which we decide *de novo.*" *State v. McKeown*, 159 N.H. 434, 435 (2009). In matters of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole. *State v. Gallagher*, 157 N.H. 421, 422 (2008). We construe the Criminal Code "according to the fair import of [its] terms and to promote justice." RSA 625:3 (2007). In doing so, we must first look to the plain language of the statute to determine legislative intent. *State v. Formella*, 158 N.H. 114, 116 (2008). "We can neither ignore the plain language of the legislation nor add words which the lawmakers did not see fit to include." *State v. Brown*, 155 N.H. 590, 591 (2007) (quotation omitted). "If a statute is ambiguous, however, we consider legislative history to aid our analysis." *State v. Lamy*, 158 N.H. 511, 515 (2009). "Our goal is to apply statutes in light of the legislature's intent in enacting them, and in light of the policy sought to be advanced by the entire statutory scheme." *Id.*

RSA 627:8 provides:

A person is justified in using force upon another when and to the extent that he reasonably believes it necessary to prevent what is or reasonably appears to be an unlawful taking of his property, or criminal mischief, or to retake his property immediately following its taking; but he may use deadly force under such circumstances only in defense of a person as prescribed in RSA 627:4.

The plain language of the statute does not limit the use of force in defense of property to instances of "theft." Assuming that the complainant's undisputed actions in exerting control over the defendant's car keys did not constitute a theft, *but see* RSA 637:3, I (2007) ("A person commits theft if he obtains or exercises unauthorized control over the property of another with a purpose to deprive him thereof."), RSA 627:8 does not require that the taker act with any particular intent in order for the actor's use of force to be justified. The statute permits the use of force in response to what

"*reasonably appears to be* an unlawful taking." RSA 627:8 (emphasis added). A taking may be unlawful without constituting a theft. *See, e.g., Rinden v. Hicks,* 119 N.H. 811, 813 (1979) ("An action for conversion is based on the defendant's exercise of dominion or control over goods which is inconsistent with the rights of the person entitled to immediate possession."). The plain language of the statute thus supports the conclusion that the use of force is justified to defend against unlawful takings regardless of the intent of the taker. *See Appeal of Astro Spectacular,* 138 N.H. 298, 300 (1994) ("The legislative intent is to be found not in what the legislature might have said, but rather in the meaning of what it did say." (quotation omitted)). The legislature's reference in RSA 627:8 to the crime of criminal mischief, *see* RSA 634:2 (2007) (amended 2009, 2010), demonstrates that the legislature could have specifically limited "unlawful taking" to the crime of theft, if it were so inclined. *See City of Manchester v. Sec'y of State,* 161 N.H. 127, 133 (2010) ("The force of the maxim *expressio unius est exclusio alterius* is strengthened where a thing is provided in one part of the statute and omitted in another." (quotation and brackets omitted)).

 To the extent that there is any ambiguity in the term "unlawful taking" suggesting a requirement of theft, such is laid to rest by the REPORT OF THE COMMISSION TO RECOMMEND CODIFICATION OF CRIMINAL LAWS (REPORT). *See* REPORT § 572:8 cmts. at 26-27 (1969). In drafting the statute justifying the use of force in defense of property, the Commission explained, "The problem of the person in possession faced with a demand for the property based on a claim of right is also dealt with here by justifying the use of force against *any* taking that appears to be unlawful." *Id.* at 26. The Commission distinguished its draft from Michigan's draft statute, which was written "in terms of preventing 'theft' which would seem to require the person in possession to stand aside when another seeks the property under a claim of right if the possessor knows that such a claim precludes criminal theft liability." *Id.* By contrast, the Commission's draft was consistent with *State v. Richardson,* 38 N.H. 208 (1859), which held that the owner of property could not use force against a sheriff seeking to attach the property because the sheriff, whom the possessor knew to be " 'duly appointed and authorized to serve the writ,' " REPORT at 26 (quoting *Richardson,* 38 N.H. at 208), did not engage in acts that would "reasonably appear to be an unlawful taking." *Id.* The Commission's report also explained that "the use of force that is justifiable to prevent an unlawful taking is also justifiable to accomplish an immediate recapture of the property," aligning itself with *State v. Elliot,* 11 N.H. 540 (1841). REPORT at 27. In that case, we upheld the use of reasonable force to "recapture" property taken under a claim of right, where the possessor had to pursue

the taker a short distance to forcefully retrieve his property. *Elliot*, 11 N.H. at 544. The Commission's report thus explicitly illustrates the legislative intent behind RSA 627:8: the justified use of force in defense of property is not limited to instances of theft, but applies to any instance of what would "reasonably appear to be an unlawful taking," regardless of the taker's intent. REPORT at 26-27. We therefore conclude that the trial court erred in refusing to give the defendant's requested jury instruction on the basis of insufficient evidence that the complainant had committed a theft. We make no ruling on any other consideration affecting the defendant's entitlement to such a jury instruction upon retrial.

*Affirmed in part; reversed in part; and remanded.*

DALIANIS, C.J., and HICKS and LYNN, JJ., concurred.